UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 8:13-cr-237-T-23TBM

DUANE CRITHFIELD

**UNITED STATES' RESPONSE TO DEFENDANT CRITHFIELD'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.   INTRODUCTION

The United States submits this response in opposition to defendant *Duane*

*Crithfield's Proposed Findings of Fact and Conclusions of Law* (or "Crithfield's Brief").

Doc. 359. Crithfield's Brief erroneously contends that: (1) the trial evidence did not

prove that Crithfield played an active role in the operation or management of

Fidelity Insurance Company, Ltd. ("FIC"), Citadel Insurance Company, Ltd.

("CIC"),[1] or Offshore Trust Services, Inc. ("OTS"); (2) there was not any evidence

establishing that Crithfield had a role in designing or implementing the Business

Protection Policy ("BPP"); (3) the BPP strategy adequately transferred risk from the

business owner purchaser to the insurance company; and (4) Crithfield understood

that the BPP did not conform to the opinions and sold it anyway.[2] *Id.*

---

[1]     CIC was incorporated in 2005, with Crithfield and Donaldson each owning 40%. CIC
offered "exactly the same products" as FIC. GX 68-T at 18:397-19:428. As a result, discussions
concerning the FIC operations after December 2005 should also be considered true for CIC, unless
noted otherwise. *See,* Doc. 359 at 11-12.

[2]     Section D of Crithfield's Brief raises a series of red-herring arguments, first noting that the 22
coverages offered under the BPP strategy were legal coverages. Doc. 358 at 8-10. For example, the
brief notes that there is nothing illegal about paying a high premium for a policy. *Id.* at 9. Of course,
the government has never suggested or argued that the categories of coverages themselves were

## II.  CRITHFIELD'S ROLE[3] IN THE TAX FRAUD CONSPIRACY

A. <u>Crithfield Pervaded the Core Entities</u>

As proven through the evidence, it is absurd for Crithfield to claim or suggest that he did not play an active role in the core entities (FIC, CIC, OTS). *See* Doc. 358 at 1-4. The collective trial evidence reveals that Crithfield and others, such as Donaldson (Crithfield's partner), created a closely-held collection of entities in the mid 1990s to market and sell offshore asset protection services, utilizing offshore trust structures to acquire and hold life insurance policies and annuity contracts and other related investments. GXs 1C; 49A at 1-16.

Indeed, Crithfield was an owner (and Director) of Alliance Holding Co., Ltd. ("Alliance"), ***which owned FIC*** (with Crithfield as its President and Director) ***and First Fidelity Trust, Ltd. ("FFT")*** (with Crithfield again as an Officer and Director). Doc. 359 at 8; GXs 1C; 49A; 62-T at 4:49-9:173 (Donaldson); 42:987-51:1213 (Crithfield). Those two Crithfield-controlled entities (FIC and FFT) subcontracted out the functions required of an insurance and trust company. *See, e.g.,* GXs 48A and 49A.

FIC and FFT utilized OTS—another entity controlled by Crithfield[4] as a

---

illegal or that an expensive insurance policy is necessarily illegal. Rather, this case concerns the established fact that the BPP strategy—as designed, promoted, and implemented—was devoid of any economic substance and was self-insurance, and so did not result in ordinary and necessary business expenses properly deductible under Section 162 of the Internal Revenue Code.

[3]    As explained throughout the government's post-trial briefs, Crithfield and Donaldson worked as partners to accomplish their illegal objectives. Accordingly, this brief focuses primarily upon Crithfield's role in the conspiracy and is not intended to articulate all of the trial evidence demonstrating Donaldson's criminal partnership role.

[4]    David McNamee was hired in mid-2002 as the OTS President. Notwithstanding his title, he acknowledged defendant Crithfield was the "number one person." GX 52-T at 20:438-448.

Director and Registered Agent—to handle their administrative needs, including the day-to-day QuickBooks accounting operations, related Lynx trust accounting, customer service, and information technology needs.[5] GXs 48A at 9-10; 49A at 11-12; 310-3 and Docs. 342 at 129:20-136:6 (Brady) and 359 at 11. Thus, when an FIC or FFT product or service was sold or rendered and premium payments/revenues were received, OTS, under Crithfield's control, was the entity that entered the receipt and/or disbursement of funds and made any adjustments to the trust accounts. *Id.* As demonstrated by GX 602—an email from Kasey Klem to Crithfield—Crithfield was the person identified by the top OTS accountant as the decision maker for the design and inner workings of the BPP strategy operation.[6]

To promote FIC's[7] and FFT's products and services, Crithfield and Donaldson created Foster & Dunhill, Ltd. ("F&D"). Doc. 359 at 9. Crithfield and Donaldson were Directors and Officers of F&D. GX 1C at 8. F&D operated as a planning and marketing company for FIC's and FFT's products and services. GXs 77-T-1 at 4:59-6:99; 62-T at 4:50-56; 49A at 12-13. FIC (and later CIC) and F&D shared the same official address in Anguilla, though F&D was physically based in

---

[5]    OTS was a Florida corporation headquartered in the Tampa Bay area. The defendants' sons—and identified coconspirators—Josh Crithfield and Chris Donaldson were the initial listed directors of OTS. Doc 359 at 11. Defendant Crithfield replaced Chris Donaldson in 1999, or prior to the BPP strategy, as a director and registered agent for OTS. Doc. 359 at 11.

[6]    The metadata information at the top of GX 602, just below the header, indicates that the email was sent on February 6, 2002 at 16:03:36 GMT, and indicates that it was delivered.

[7]    To manage risk associated with FIC's life insurance products (pre-BPP), FIC entered into reinsurance contracts with large, established reinsurance companies, such as General Cologne Re. *Id.* at 13. However, for risk associated with the BPP, FIC created bogus reinsurers as discussed below. FFT acted as the trustee and owner of most of FIC's life and annuity policies. *Id.*

Freeport, Bahamas, and Tampa. GXs 77-T-1 at 4:59-6:99; 62-T at 4:50-56; 1C at 8-9, 18. F&D enlisted a network of "advisors"[8] to pursue its marketing agenda, who were paid handsomely for delivering clients to FIC and FFT. *See, e.g.,* Doc. 351 at 43:20–49:9 (Lustig); GXs 1F1-1F5; 74-T at 9:192-11:226.

Further, FFT also created and owned an offshore entity named Waterberry, which held an account at the National Bank of Anguilla and was co-located with FFT.[9] GXs 1C and 74-T at 10:216-11:231. Donaldson was Waterberry's President, executing documents on Waterberry's behalf. *See, e.g.,* GX 455. Per McNamee, certain controlled entities, such as FIC and F&D, were operated as "break even" companies and the remaining proceeds ("money and all the commissions that would have been attributed to the compan[ies]") were deposited into the Waterberry account. GX 74-T at 10:216-11:222. Waterberry was then used to indirectly pay commissions to the F&D "advisors." Doc. 351 at 43:23–49:9 (Lustig); GXs 1F1-1F5.

Thus, Crithfield's ownership and control of the core entities pervaded every aspect of the operation: the marketing and sale of FIC's insurance products (life policies and annuity contracts) and FFT's trust-related services (F&D); the receipt of

---

[8]     It was not required by F&D or other entity involved for the "advisors" to have any license to market and sell the BPP strategy products. GX 74-T at 6:117-120. As explained by then-FIC President David McNamee, the conspirators used the term "advisor" rather than "salesperson" to avoid the appearance that F&D (through Waterberry) was paying a commission, which it was. GX 70-T at 5:86-9:176. In reality, the only apparent requisite to work as an "advisor" was the ability to sell the BPP strategy; or, as McNamee explained in describing the knowledge level of one of the well-compensated "advisors": "John wouldn't know a life policy from a Poptart[.]" *Id.* at 8:148-149.
[9]     Crithfield's Brief claims that Crithfield was associated with a variety of companies over a large geographic area. It should be noted that the BPP strategy entities, FIC, CIC, F&D, and Yield Enhancement Co., were co-located, as were FFT, INMIHAAB, Waterberry, and Citadel Management. GX 1C at 18.

funds and accounting for FIC and FFT (OTS); the issuance of any FIC life policies

and annuity contracts (FIC); the creation and funding of any trusts (FFT and OTS);

and any related commission payments to F&D's "advisors" (Waterberry).

B.  The Creation and Implementation of the BPP Strategy

In 2001, Crithfield and Donaldson developed and began selling a new FIC

"insurance" product, the BPP, which was marketed and sold to U.S. business

owners. Doc. 359 at 12. The BPP strategy worked in practice as follows: the business

owner would purchase a BPP and deduct the amount of the BPP premium from the

business's taxable income; then, barring any claims by the business, 85% of the

premium would be returned to the control of the business owner via an offshore

trust. *Id.* The BPP strategy was often promoted at conferences held in off-shore

locations. *See, e.g.*, GX 63-T at 4-5. Crithfield attended significantly all such

conferences. GX 60-T at 12:259-264. The marketing materials associated with the

BPP strategy typically included a description of Crithfield's background, touting him

to be the highly educated (Master's in Business Administration) and sophisticated

President of FIC, with expertise in international financial services (specializing in

offshore banking and trust operations). Doc. 359 at 13 n.7. Crithfield, as President of

FIC (and later CIC),[10] reviewed and signed the BPP's Insuring Agreement, or cover

page, issued as a component of each policy. *See, e.g.*, GXs 209-5d2 at JAMES-B-

---

[10]     David McNamee moved into the role of FIC President in 2005, replacing Crithfield, who
continued as CIC President. *See* GXs 52-T at 3:36-44; 60-T at 9:170-172. McNamee assumed some
of Crithfield's duties, including signing the FIC Insuring Agreements. *See, e.g.*, GX 209-5d2 at
JAMES-B-00314.

00337; JAMES-B-00352; JAMES-B-00378; 222-2d3 at FULLER-J-0505; and 413-5 at CIC006283 (Florida Radiology Associates).

When FIC received a BPP premium payment, approximately 12% would be forwarded to Waterberry,[11] which would then compensate the F&D "advisor" responsible for the sale. Doc. 359 at 34. For example, when F&D advisor Theodore Lustig sold Dr. Christenbury FIC's BPP strategy—consisting of a $500,000 BPP policy and trust structure funded with $2,000,000—Waterberry paid Lustig (using Lustig's TLTG Planners, LLC account) 6% of Dr. Christenbury's *"total investment" of $2.5 million*,[12] or $150,000. Doc. 351 at 43:23–49:9; GX 1F1. Other than the 12% sent to Waterberry and approximately 3% paid to other third parties, the remaining approximately 85% would be deposited into the FIC savings account where it remained until the policy term expired. Doc. 359 at 34-35.

Also in 2001, FIC purportedly entered into a Reinsurance Agreement with an entity named Federation Re, Ltd. ("Fed Re"), to address certain issues associated with the BPPs' risk transfer and distribution structure, rather than addressing such issues through General Cologne Re. GXs 600; 705; 705A; 705C; and 725. Unlike

---

[11]     The Waterberry shares were owned by FFT (with Crithfield as an Officer and Director), which was an Alliance subsidiary owned, in part, by Crithfield. GX 1C at 15. Moreover, as explained in July 2006 by McNamee (then-president of FIC), Waterberry was owned by Crithfield, Donaldson, and Lake, and was the entity used to pay commissions to the F&D advisors responsible for generating the BPP strategy transactions. GX 74-T at 11:219-231.

[12]     In discussing his fee associated with Dr. Christenbury, Lustig made no distinction between the insurance component ($500,000) and the amount used to fund the trust ($2,000,000), but instead considered the $2.5 million as Christenbury's "total investment." Doc. 351 at 49:3-9. Per Lustig and GX 1F1, Waterberry paid him (through TLTG Planners) a total of approximately $2.5 million in commissions. Doc. 351 at 43:23-44:13; GX 1F1. Like payments from Waterberry to other F&D advisors can be found in the same exhibit series, or GX 1F1-1F5.

General Cologne Re, Fed Re was part of the Alliance group of companies. Chris Donaldson (son of defendant Stephen Donaldson) signed the Reinsurance Agreement for Fed Re as its President. GX 725. Fed Re, originally named Lloyd's Underwriters, Ltd., was—like Waterberry—owned by and co-located with FFT (and so, in part, controlled by Crithfield). GX 1C at 4, 17-18.

C.     The Lord Bissell & Brook Tax Opinion and Subsequent Withdrawal

As part of its BPP marketing strategy, FIC secured a written legal opinion in September 2001 from the law firm Lord Bissell & Brook ("LBB"), opining that the business that purchased a BPP would be entitled to an income tax deduction (under Section 162 of the Internal Revenue Code) for the amount of the insurance premium paid by the business to FIC. GX 600.[13] The LBB opinion was based, in part, upon representations made to LBB about the BPP strategy, including representations concerning the planned risk transfer and distribution structure. Doc. 343 at 28:5-32:13 (Walsh). That structure was premised upon the existence of a legitimate, consequential Reinsurance Agreement between FIC and Fed Re and an "Agreement to Guaranty" between Fed Re and the corresponding SAs (LLCs). GXs 705; 705A, 705C, and 705F. F&D touted the LBB opinion to help persuade business owners to purchase the BPP strategy. Doc. 359 at 20.

---

[13]     In Crithfield's Brief, multiple references are made to conclusions or opinions asserted by the LBB and HTD law firms in their respective opinions. *See, e.g.*, Doc. 358 at 5. Such references should be summarily rejected given that the trial evidence overwhelmingly proved that, as is typically the case, the letters were premised upon specific representations by FIC (and later CIC) about the risk transfer and distribution structure of the BPP strategy, which were in both instances—the LBB and HTD letters—materially misrepresented by the insurance company. Moreover, LBB withdrew its letter retroactively. So, any reference to that letter is off base.

LBB's 2001 opinion letter came under LBB's review in 2003 when the law firm was asked by FIC to reissue the opinion letter. *Id.* at 31. Crithfield and Donaldson were personally involved in that review process. *Id.* at 32-33. During the review, FIC was unable to produce to LBB any audited financial statements, despite LBB's requests. Doc. 343 at 49:21-57:11; GX 707. Instead, FIC only produced to LBB a set of unaudited financials[14] that failed to employ proper insurance accounting for the BPP strategy and were devoid of various necessary reserve accounts that could be utilized to cover any potential BPP claims. Doc. 359 at 33 n.18.

Upon examining BPP strategy underwriting documents and after speaking with Crithfield, Donaldson, and others, the LBB attorneys determined that no risk was transferred from the "insured" business to FIC, nor was any risk transferred from FIC to Fed Re. *Id.* at 32. Instead, LBB's 2003 review concluded that significantly all of the risk was held by the U.S. business owner's corresponding SA (LLC), which was contrary to LBB's understanding in 2001. *Id.* On August 26, 2003, LBB expressly notified FIC that LBB was retroactively withdrawing its 2001 opinion

---

[14]     The defendant raises the argument that in Walsh's testimony, Walsh did not say that he discussed the BPP itself with Crithfield, either as he understood it to be administered or how it was actually administered. Doc. 358 at 5. Of course, that is erroneous. Walsh, who understood that Crithfield and Donaldson were partners, participated in one or more telephone conversations with Crithfield during which LBB attorneys asked Crithfield about why the BPP premiums were so high, the 3 to 1 (policy limit to premium) ratio, the lack of claims, and the LBB concern that no risk was passed from the business to FIC (or even Fed Re). *See* Doc. 343 at 59:6-65:12; GX 712a2. Per Walsh, the LBB attorneys received no satisfactory answers. *Id.*

Further, Crithfield's Brief also claims that GX 49A includes FIC's financial statements as audited by Deloitte & Touche conducted according to International Accounting Standards. Doc. 358 at 2. In fact, that audit only concerns ***FIC's year ending December 31, 1999***, which was well before the BPP was created by FIC. GX 49A. The other financial statements appear to be the same unaudited, deficient financial statements provided to LBB. *Id.*; GX 706a; Doc. 343 at 50:4-11.

letter. DX 10E; GX 721. The LBB withdrawal letter noted that FIC—with Crithfield as President—had represented certain material facts to LBB about the BPP strategy which were untrue, such as: (1) **_FIC would retain all liability for the first 5% of any losses_** under the BPP; and (2) **_an independent third party reinsurer would retain all liability for 20% of any losses_** in excess of the first 5%.[15] _Id._ at 32-33; DX 10E at 2; GXs 705A, 705C, 705F, and 721.

Significantly, the evidence proved that the risk transfer and distribution structure of the BPP as implemented by FIC was nothing more than a well-papered sham and that **_Crithfield, as FIC President and FFT Officer and Director,_** was positioned to necessarily know the material facts. As FIC's President, Crithfield was privy to FIC's basic financial information, including FIC's bank account balances and budget information, and he was surely knowledgeable about which companies FIC engaged for critical products/services, like reinsurance. _See, e.g._ 49A at 2.

Based on his ownership and/or officer status in the core entities, Crithfield was obviously aware that: (1) **_Fed Re was owned by and co-located with FFT_**, an Alliance subsidiary in which Crithfield was an Officer and Director (GX 1C at 4, 18); (2) **_Fed Re had no bank account_** during the relevant period (_see_ Doc. 359 at 33;[16] _and see_

---

[15]     Moreover, it should be noted that, per GX 704, Crithfield responded to LBB that he, Crithfield, was "agreeable" that "the shareholder of the insured business [would not] be a beneficiary of the trust that own[ed] the VUL insurance policy[,]" which, was completely false, particularly given the substance of Donaldson's BPP strategy pitch.
[16]     The one and only transaction recalled by Brady concerning Fed Re was in 2006 (and a bank account located in the Dominican Republic), long after Fed Re was involved in the BPP strategy contracts as a reinsurer. Doc. 359 at 34 n.19.

GX 602); (3) *FIC never paid 80% of its BPP premiums received to Fed Re* (65% initial

and 15% deferred) as required under the supposed FIC-Fed Re Reinsurance

Agreement (Doc. 359 at 35; GXs 705C, 725); and (4) *Fed Re never made any payments*

*to any SAs (LLCs) in accordance with the integral Agreement to Guaranty* (GX 705F).

Such facts/(non)occurrences cannot be accurately described as "oversights" or

"missteps." Each of the above is at the core of the purported BPP strategy model.

Crithfield likewise had to know that the BPP premiums were initially

determined by the business owners based upon a desired business tax deduction,

rather than by FIC (or an actuary, since FIC did not use actuaries for the BPP

strategy).[17] As explained by then-FIC president McNamee in September 2005:

> . . . I think the first question is how much premium you want to pay for the
> [BPP]? In other words, how big of a deduction do you need to take?
> * * *
> And—and then—and then from there we can work backwards—
> * * *
> --and you can get the biggest deduction you can afford to, you know, fund.

GX 64-T at 8:132-147.[18] Crithfield also had to be aware that FIC was returning

approximately 85% of every BPP premium to the business owner's corresponding SA

(LLC) at the BPP's expiration (rather than paying any amounts to Fed Re under the

Reinsurance Agreement).

Moreover, because Crithfield—as FIC President into 2005—actually signed

---

[17]     Crithfield's Brief claims that David McNamee, as FIC's President, handled the actual
management of FIC. However, as explained in this filing, McNamee transitioned to FIC President
in 2005, assuming the position from Crithfield, who was also the President of CIC.
[18]     It should be noted that McNamee learned the details of the BPP strategy directly from
defendant Crithfield. *See* GX 74-T at 35:809-36:819.

the Insuring Agreements that accompanied the FIC policies, Crithfield must have personally experienced and observed the significant delays between the business owners' BPP premium payments to FIC (and corresponding multiple payments to FFT to fund the corresponding trusts) and the final policy issuance dates, caused by the bizarre backfilling process utilized (by Ashton Tiffany (not an actuary)) to match the final BPP coverage mix to the BPP premium amount already paid. *See, e.g.,* Doc. 359 at 26-29; GX 61-T at 3:40-4:50 (McNamee explaining that you keep adding coverages until you reach the number you want). After all, such extended delays in determining the final BPPs' coverage mix would have negatively impacted any genuine reinsurance efforts, since it would have been impracticable, if not impossible, to reinsure coverages that had yet to be determined.

The evidence further made clear that Crithfield and others involved with the BPP necessarily appreciated that the BPP was merely self-insurance that necessarily disincentivized the BPP clients from making claims.[19] GX 48A at 6-7 and 49A at 8. Throughout the entire period Crithfield was FIC President, FIC never even anticipated the possibility that any BPP claims might be made against the policies:

---

[19]     Which explains why FIC never rejected any of the BPP applications. *See* Doc. 68-T at 59:1390-60:1394 (McNamee). Thus, per Dr. Babbel, the BPP strategy had a "self-reinsurance link . . . the owners of the company actually absorb all of the risk. . . . there is [sic] no other parties, essentially, that are at risk." Doc. 352 at 69:17-20; see also *id.* at 103:12-20 (explaining that the self-insurance link incentivized taxpayers to not make a claim against themselves). Dr. Babbel further noted that the extremely low number of claims (specifically, two) over the course of the BPP strategy, given the moral and morale hazards in the policies, made sense because "the BPP system was set up in such a way that that hazard would be absorbed by the insured themselves and that's why it works." Doc. 346 at 28:19-29:9 (discussing GX 542).

first, FIC had no established BPP claim forms or procedures as of at least December

2005;[20] and second, FIC maintained no reserve accounts in its (unaudited) financial

statements to guard against any potential BPP claims. Doc. 359 at 32-33; GX 721.

As acknowledged by FIC's attorney, Chris Harris, in August 2003, it was "no secret"

that BPP strategy clients had "some interest in not making claims." GX 721.

> D. The Follow-On Handler, Thayer & Duggan, L.L.C. Tax Opinion Letter

Notwithstanding Crithfield's direct involvement in the LBB review and receipt

of the August 26 and October 8, 2003 LBB letters—which specifically raised FIC's

material misrepresentations to LBB and the inherent flaws in the design and

implementation of the BPP strategy—FIC quickly sought and received a follow-on

opinion letter from a second law firm, Handler, Thayer & Duggan, L.L.C. ("HTD")

in December 2003. *See* GX 212-3m. Not surprisingly, the HTD opinion letter relied

on many of the same or similar misrepresentations as those made to LBB to secure

the 2001 tax opinion. *Compare* GX 212-3m at TL-002177-90 *with* GX 705, 705a.[21]

For example, FIC represented to HTD that: (1) the BPP premium amounts

charged by FIC were calculated at arm's length in accordance with sound actuarial

principles (GX 212-3m at TL-002181, 002184); (2) FIC could enter into a

---

[20]     There were three claims made against BPP policies prior to May 2007, the month during which the search and seizure was executed at OTS and other locations in the Tampa Bay area. Doc. 342 at 193:7-197:2. The first two BPP strategy claims were raised in December 2005, each for approximately $10,000, and involved BPP clients Dray and Thomas & Kidd. *See, id.*; GXs 535, 536. Per Brady, she did not recall paying anything out on the Dray's claim, leaving just the $10,000 claim by Thomas & Kidd and the later Florida Radiology Associates' claim ($100,000 claim) as the only two claims paid prior to May 2007. Doc. 342 at 193:7-197:2.

[21]     Potential clients were not told of the LBB withdrawal, and relied on the defendants' and their advisors' representations of the legality of the strategy. *See* Doc. 359 at 21-22.

Reinsurance Treaty with an unrelated, adequately capitalized reinsurance company to cover FIC's risks associated with the BPP (*Id.*at TL-002181, TL-002187); and (3) the reinsurance company could similarly obtain a "Guaranty" through pooled reinsurance investment funds to cover risks associated with the Reinsurance Treaty. *Id.* at TL-002181,002190. Further, the HTD opinion letter relied upon the asserted fact that the primary liability associated with any BPP remained with FIC, and FIC would pay any claims in full prior to seeking reimbursement from a reinsurer. *Id.* at TL-002182. Similarly, the reinsurer was required to reimburse FIC in full prior to seeking any funds from the Guaranty. *Id.* Finally, the HTD opinion letter included language clarifying:

> In its solicitation of the [BPP], including its preparation and presentation of promotional materials, [FIC's] primary emphasis is on the risk protection provided by the [BPP], and any discussion of potential tax benefits is incidental.

*Id.* at TL-002186.

The evidence established that there were no material changes or alterations to the Alliance group of companies involved in the BPP strategy as of December 22, 2003, the date of the initial HTD letter. *See* GXs 1C; 213-3m. Yield, originally named FIC Yield Enhancement Corporation, Ltd., was created in Anguilla on December 31, 2003. GX 1C at 16. Per Yield's corporate filings, Yield was owned by FFT and co-located with FIC and F&D, and Crithfield was a Director.[22] *Id.* at 16-18. Yield

---

[22]     Per the evidence, Yield was purported to be a limited partnership "fund" for "pooling" purposes. GX 400. INMIHAAB, LLC—an entity owned by FFT and managed by Donaldson, was identified in Yield agreements as Yield's General Partner. Brady provided trial testimony that demonstrated that two key documents that purportedly were utilized as part of the BPP strategy's

first established a bank account on December 20, 2005, but had no meaningful

transactional activity until mid-December 2006. GX 30L.

The only other material change to the Alliance group after December 2003

came in December 2005, when CIC filed its incorporation documents. GX 1C at 2.

Crithfield was a listed Director and Shareholder of CIC, which was then co-located

with FIC, F&D, and Yield. *Id.*at 2, 17-18. However, it should be noted the evidence

proved that CIC did not maintain adequate funds to pay potential claims against the

BPP which, of course, was contrary to representations made about the BPP strategy

to secure the HTD opinion. Doc. 349 at 102:8-103:25 (Dubinsky); GX 140A.

Thus, as explained by Brady, from a funds flow perspective, there was no

material change in the implementation of the BPP strategy until approximately mid-

December 2006. Doc. 342 at 168:24-169:10; GXs 310-1; 310-2. At that point, the

funds flow for BPP transactions was changed, but not in a meaningful way. Doc. 342

at 170:8-176:24; *compare* GXs 310-1 and 310-2. The only difference in the fund flow

for BPP transactions occurring after mid-December 2006 was that, at the BPP

termination, the payout, approximately 85% of the premium amount plus interest,

would no longer be transferred directly from the FIC operating account to the FIC

escrow account (reflected in the SA's (LLC's) ledger); instead, the payout would pass

from the FIC operating account through a Yield account and then, *typically the same*

---

risk transfer and distribution structure—an "Insurance Guaranty Agreement," purportedly between
FIC and Yield, and a "Subscription Agreement," purportedly between Yield and the SAs (LLCs)
(*i.e.,* GXs 208-5k and 400)—were just sham documents apparently created to support the tax fraud
conspiracy. Doc. 342 at 168:24-183:11; *and see* GXs 304, 306.

*day*, back to the FIC escrow account (reflected in the SA's (LLC's) ledger). Doc. 342 at 170:8-183:11; *and see* GXs 30L,304, 306,310-2.

Other FIC (or CIC) material representations noted as a basis for the HTD tax opinion letter, were also false: (1) the BPP premiums paid for the BPPs continued to be determined by the business owners rather than FIC or CIC (*see, e.g.* Doc. 343 at 185:14-187:7 (Williams)); (2) FIC (or CIC) did not enter into any reinsurance agreement that involved an actual ceding of risk to an independent adequately capitalized third party, in that, the two purported reinsurance companies/entities involved, Fed Re and Yield Enhancement Company, Ltd. ("Yield") were just paper facades, created by the conspirators for use in the tax fraud conspiracy (*see supra* or Doc. 359 at 39-44); (3) no risk was transferred by the business purchasing the BPP to FIC or CIC (Docs. 346 at 41:15-51:17 (Babbel); 349 at 98:12-103:25 (Dubinsky); GX 140A; and (4) the primary emphasis in the BPP promotional materials and related conference presentations was on the potential tax benefits of the BPP as an investment strategy, rather than on the insurance or risk protection provided by the BPP. *See, e.g.*, 63-T at 3:43-5:95 (Donaldson).

Moreover, Crithfield, as an Alliance Owner and Director, embraced his role as head of the "Alliance Group of companies" in Alliance's Quarterly and Annual Reports ("Alliance Reports") that included detailed BPP client statement information compiled from data originally captured for FIC (and later CIC) and FFT by OTS. Typically, the Alliance Reports were presented under a cover letter from defendant Crithfield as Alliance's Director, who glowingly touted his companies'

products and related investment opportunities. *See, e.g.,* Doc. 342 at 183:12-190:11 (Brady); GXs 220-6k1 at WILLIAMS-E-00562; 222-3K at FULLER-J-01244.

Thus, just as above in discussing the LBB opinion letter, the evidence clearly proves that Crithfield was involved in and knowledgeable about each of the material misrepresentations made to HTD to secure the follow-on opinion. More specifically, Crithfield's ownership and control of and/or proximity to the core Alliance group of companies (particularly subsidiaries FIC and FFT), Crithfield's direct participation in the LBB opinion review and withdrawal, and the BPP strategy's use of multiple sham documents to create and maintain the illusion that the BPP strategy involved true risk shifting and distribution (which was false) in order to secure the HTD opinion letter, all combine to prove that Crithfield was a direct and knowledgeable participant in the charged tax fraud conspiracy.

E.   The BPP Strategy was Self-Insurance with No Risk Transfer

Dr. Babbel examined the overall structure of the BPP strategy transactions and the extent to which there was any transfer of insurable business risk from the U.S. taxpayer's business to the insurance company, FIC or CIC. Doc. 352 at 51:12-53:17. Dr. Babbel analyzed both purported BPP strategy risk transfer and distribution scenarios; the first involved the Reinsurance Agreement between FIC and Fed Re in which FIC purportedly retained 5% of any BPP losses (GX 725); the second involved the Insurance Guaranty Agreement between FIC (and later CIC) and Yield.[23] GX

---

[23]   Crithfield's Brief asserts that, because FIC and CIC were obligated to pay claims under the contracts, the government's arguments concerning risk are irrelevant. Doc. 358 at 11. As explained

208-5K. As to the first purported risk transfer scenario,[24] that involving the FIC and

Fed Re Reinsurance Agreement, Babbel explained that, per the relevant reinsurance

contract, FIC purportedly retained 5% of the BPP limit as risk and ceded the

remainder to Fed Re. Doc. 346 at 44:10-24; GXs 705c; 725. However, the

consideration paid by FIC to Fed Re (80% of the total FIC premium received paid in

two parts, 65% paid as Initial Reinsurance Premium and 15% as Deferred

Reinsurance Premium) was reduced by whatever amount FIC had to cover. *Id.* In

other words, whereas per the Reinsurance Agreement FIC appeared to retain 5% of

the BPP policy limit as risk, FIC's consideration to Fed Re was offset by any amount

that FIC had to cover under the agreement. *Id.* at 45:1-21. Importantly, from an

economic stand point, an "insurance" scenario that results in equal cash flows in

opposite directions is the same as, or equal to, a scenario that involves no risk

shifting. *Id.* So, there is no impact on FIC regardless of the amount of any claim

filed, which means there is no risk transferred to FIC. *Id.* Mr. Dubinsky's forensic

analysis, which scrutinized the actual manner in which the BPP strategy was

implemented, arrived at the same opinion as Dr. Babbel, that being, that the U.S.

by Dr. Babbel and Mr. Dubinsky at trial, under no circumstances would FIC or CIC be required to pay claims from its own pocket. Instead, any payment by FIC or CIC would ultimately be recouped from the corresponding SA (LLC). The same conclusion was reached by LBB's Walsh, who explained that FIC "never [had] any risk of loss." Doc. 343 at 62:10-11.

[24]     Dr. Babbel presented three different proofs at trial concerning FIC and Fed Re, FIC and Yield, and CIC and Yield. For no particular reason in Dr. Babbel's trial presentation, the FIC and Yield scenario was addressed first, using pedagogical slides GX 130 at 46-47; the earlier FIC and Fed Re scenario was explained next, GX 130 at 48-49. Finally, the CIC and Yield scenario mirrors FIC and Yield and was explored near the end of the section. GX 130 at 50-51. For clarity purposes, the government presents each scenario in the proper chronological order first addressing the FIC and Fed Re scenario, and then moving to the FIC and Yield scenario

business owner purchasing the BPP transferred no risk to FIC. Doc. 349 at 96:15-17.

As to the second purported risk transfer scenario, that involving the FIC and Yield Insurance Guaranty Agreement, Babbel explained that, per the relevant contract, FIC purportedly retained 15% of the BPP limit as risk and ceded the remaining 85% to Yield. Doc. 346 at 44:10-24; GX 208-5K at 2. However, "the consideration paid to [Yield] is equal to 85 percent of the premium that's collected by FIC minus whatever [FIC] pay[s] in the retention." *Id.* at 42:8-15. As noted by Dr. Babbel:

> This is very curious. I have never seen anything like this. You see the retention of FIC is equal to 15 percent of the loss, but then [Yield] gets their money less whatever the retention was. So there is no retention essentially. They are completely reimbursed, there is no [risk] transfer.

*Id.* at 42:16-21. Babbel added: "the consideration paid to [Yield] is reduced by the same amount…that FIC is responsible for. And so it ends up FIC gets—it cancels out and so they have no risk." *Id.* at 43:23-25. Moreover, looking at FIC's potential profitability, Dr. Babbel explained: "whatever the retention of [FIC], you substitute any figure for premium and loss and you still get 15 percent. So it's a business that— to which no loss is transferred by contract." *Id.* at 44:2-5.

Dr. Babbel concluded the risk transfer analysis section of his presentation by explaining that, as to the final scenario involving the Insurance Guaranty Agreement between CIC and Yield, the analysis and proofs are the same as the analysis and proof concerning FIC and Yield, except that the retention of risk has changed from 15 to 17 % and the corresponding consideration to Yield was 83% of the premium.

Again, the retention that CIC was purportedly responsible for was exactly offset in the relevant agreement by a reduction in any consideration paid to Yield. *Id.* at 46:17-47:6; *see also* id. at 48:11-17.[25]

Mr. Dubinsky also forensically examined the FIC and CIC BPP strategy operations as they related, or failed to relate, to the risk transfer and distribution structure described in the HTD opinion letter, and examined the Insurance Guaranty Agreement purportedly between FIC (or CIC) and Yield and the Subscription Agreement purportedly between Yield and the SAs (LLCs). Mr. Dubinsky concluded that the transactions were not conducted at arm's length, lacked economic substance, and were structured and implemented contrary to the legal opinions. Doc. 359 at 36-41; *and see* GX 140.

Notably, as explained above, there was only one claim of substance made against a BPP prior to the May 2007 search and seizure. That claim was submitted in approximately August 2006 by Florida Radiology Associates ("FRA"). Doc 359 at 44. The funds used to satisfy the claim were derived from *only two sources*, FRA's BPP premium payment and FRA's SunTrust account. Doc. 342 at 196:11-25. In other words, "the entire insurance claim payment came from the taxpayer's own funds" and so was akin to self-insurance. Doc. 349 at 74:14-75:2 (Dubinsky), *see also*

---

[25]      Dr. Babbel referred to a paragraph on page 7 of GX 520-6app as "rubbing salt in a wound." He explained that per the BPP application, once a potential BPP client submitted a premium payment and application, should the application be withdrawn and a return of the escrowed premium payment be requested, a 15% charge would be deducted for underwriting and administrative costs. In essence, no matter what occurred after the BPP premium payment was made, FIC would retain 15%. Doc. 346 at 47:7-48:4.

pedagogical GX 140 at 56-64. Further, the manner in which the FRA claim was handled negates any argument or suggestion that FIC or CIC at any time prior to the search had implemented any aspect of the "pooling" concepts contained in the HTD opinion (and resulting Subscription Agreement): if such had been the case, the FRA claim would have necessarily affected all of the Yield payouts in December 2006, which did not occur. *See id.* at 76:1-12.

## IV. CONCLUSION

As demonstrated at trial, Crithfield's contentions simply ignore the overwhelming evidence proving that Crithfield was knowledgeable about and personally involved with the BPP strategy design, creation, implementation, and promotion. Crithfield is guilty of the tax fraud conspiracy charged in Count One (in violation of 18 U.S.C. § 371), as well as the two related substantive counts, Counts Two and Three (charging violations of 26 U.S.C. § 7206(2)).

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

By:     */s/ Jay G. Trezevant*
        Jay G. Trezevant
        Assistant United States Attorney
        Florida Bar No. 0802093
        400 North Tampa Street, Suite 3200
        Tampa, Florida 33602
        Telephone: (813) 274-6000
        Facsimile: (813) 274-6125
        E-mail: jay.trezevant@usdoj.gov

/s/ Megan K. Kistler
Megan K. Kistler
Assistant United States Attorney
United States Attorney No. 161
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6125
E-mail: megan.kistler@usdoj.gov

**U.S. v. Duane Crithfield, et al.       Case No. 8:13-cr-237-23TBM**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 16, 2016, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following counsel for defendants:

Curtis S. Fallgatter, Esquire
Gordon Rhea, Esquire


*s/ Jay G. Trezevant*
Jay G. Trezevant
Assistant United States Attorney